# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
HAIGHT, PENLAND, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant JARED D. HERRMANN**
**United States Army, Appellant**

ARMY 20131064

Headquarters, Fort Carson
Timothy Grammel, Military Judge
Lieutenant Colonel Stephanie D. Sanderson, Staff Judge Advocate

For Appellant: Captain Patrick J. Scudieri, JA (argued); Colonel Kevin Boyle, JA; Major Amy E. Nieman, JA; Captain Patrick J. Scudieri, JA (on brief).

For Appellee: Captain Anne C. Hsieh, JA (argued); Major A.G. Courie III, JA; Major Steven J. Collins, JA; Captain Anne C. Hsieh, JA (on brief).

18 April 2016

---------------------------------
OPINION OF THE COURT
---------------------------------

HAIGHT, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of willful dereliction in the performance of his duties and reckless endangerment, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934 (2012) [hereinafter UCMJ].[1] The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for ten months, forfeiture of all pay and allowances, and reduction to the grade of E-1.

---

[1] The military judge acquitted appellant of solicitation to commit an offense, false official statement (two specifications), and obstruction of justice.

This case is before our court for review under Article 66, UCMJ.[2]  Appellant assigns multiple errors and raises several issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).  One of appellant's assigned errors merits discussion but no relief.

## BACKGROUND

Appellant was a noncommissioned officer (NCO) parachute rigger in the 10th Special Forces Group (Airborne) who was assigned as an In-Process (IP) inspector of parachute packers at the Consolidated Parachute Rigging Facility at Fort Carson, Colorado.  An IP inspector ensures the parachutes are packed in accordance with the appropriate training manual, guidelines, and standard operating procedures; ensures that all intermediate rigger checks are conducted and satisfied; and signs off on the final parachute pack reports and individual parachute pack logs.  "Pencil packing" refers to a procedure in which those responsible fail to pack or inspect a parachute properly yet nevertheless fraudulently sign off on the parachute as being properly packed and inspected.  At the rigging facility, not only are main parachutes packed and readied for use, but so are reserve parachutes.  For safety reasons, at least every 365 days, each reserve parachute is unpacked, re-packed, inspected, and signed off as suitable for use and "airworthy."

On one occasion in February 2013, appellant was assigned as the IP inspector over a team of three packers detailed to re-pack a daily quota of parachutes to include some reserve parachutes that were about to go beyond the 365-day in-service cycle.  The evidence in this case showed that appellant and all three of the packers he supervised, in order to speed up the process and go home early, pencil packed approximately fourteen reserve parachutes in that they signed off on a number of parachutes without even opening or "popping" them, let alone checking, re-packing, or inspecting them.  Significantly, these reserve parachutes came from a lot that had been provided to the Jumpmaster school for use as training aids in the Jumpmaster Personnel Inspection class.  Consequently, these parachutes had deficiencies of varying severity intentionally rigged into them so the jumpmaster students could identify the deficiencies.  The deficiencies—to include but not limited to missing ejector springs in some and faulty closing loops in others—that existed in the pencil packed chutes remained, notwithstanding the packer's and appellant's signatures certifying them as fit for operational use.

For this, appellant was charged with and convicted of "wrongfully and recklessly engag[ing] in conduct, to wit:  failing to conduct Pack In-Process Inspections as the designated Pack In-Process inspector of T-11 Reserve parachutes

---

[2] Oral argument in this case was heard in Columbus, Ohio on 11 January 2016 at the Ohio State University Moritz College of Law as part of the Outreach Program of the United States Army Court of Criminal Appeals.

provided to Parachute Riggers under his supervision for packing, conduct likely to cause death or grievous bodily harm to soldiers exiting an aircraft during airborne operations with the T-11 Reserve parachutes that had not been repacked, which conduct was to the prejudice of good order and discipline in the armed forces and was of a nature to bring discredit upon the armed forces."

Appellant asserts his conviction of reckless endangerment is insufficient in that the evidence did not show that pencil packing is *likely* to cause death or grievous bodily harm.

## LAW AND DISCUSSION

The well-known and oft-cited test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of [appellant's] guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Id.* at 324-25 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The elements of the offense of reckless endangerment charged under Article 134, UCMJ, as delineated by the President, are:

> 1) That the accused did engage in conduct;
>
> 2) That the conduct was wrongful and reckless or wanton;
>
> 3) That the conduct was likely to produce death or grievous bodily harm to another person; and
>
> 4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

*Manual for Courts-Martial, United States* (2012 ed.) [hereinafter *MCM*], pt. IV, ¶ 100a.b.

### *Testimony at Trial*

In order to show the likely consequences of appellant's willful dereliction, the government presented to the fact finder the following testimonies. First, the NCO in charge of the rigger facility decried pencil packing as "life threatening." Then, he

stated, "If parachutes are [compromised], lives are in danger and what I mean by [compromised], if they weren't packed as they were supposed to be, lives are potentially in danger. If they weren't inspected as they were supposed to be, lives are potentially in danger." To illustrate his point, this witness elaborated that if one jumped and the main parachute lost its lift capability, and the reserve parachute with its rigged-in deficiency such as a missing ejector spring was relied upon, the "plausible outcome" would be death and "you would die" or at least "be injured severely."

Second, the rigger shop Officer-In-Charge said that if one were to have needed to employ one of the pencil packed parachutes with its now known deficiencies, that user would "potentially die or get seriously hurt." Furthermore, this witness revealed that his testimony regarding the potentiality of death as a consequence of this type of behavior was based upon his "seeing" a "daughter lose a dad" as a result of "deficiencies in a reserve parachute or a parachute of any kind."

Third, the military's T-11 parachute project lead, a Senior Aerospace Engineer, explained that "everything with respect to a parachute, main or reserve, is especially important when inspecting it to make sure that it's airborne safe and airborne certified to jump, ready to jump." He further elaborated that a reserve parachute with one of the specific deficiencies identified as existing in the pencil packed chutes such as a missing ejector spring or inadequate closing loop could either not quickly deploy or unintentionally deploy. In either scenario, the deficiency could "potentially cause serious injury or death to the paratrooper."

One of the other IP inspectors at the facility on the day in question expressed, "It's dangerous, sir. There is a reason those parachutes have to be pulled down and repacked because that reserve is the last line of defense for a jumper if there is an issue with the main parachute. To put a product out on a jumper that's not to standard is not acceptable" and could lead to death if "that reserve is not to standard." This same witness continued, "I was the malfunctions officer on a parachute fatality the December prior to that. It was a pretty brutal experience and I was hypersensitive to the fact that potentially there was somebody missing a [functional] reserve parachute."

At trial, while the element of likelihood of death or grievous bodily harm was not expressly conceded by the defense, the record of trial does not reveal much dispute over this particular aspect. In fact, in his sentencing argument, trial defense counsel acknowledged that all of appellant's confederates agreed that their actions "endangered life." Appellant now argues "the government failed to prove that it was likely that the reserve parachutes would have been necessary during a jump and, if deployed, would have failed, and that failure would have [led] to death or grievous bodily harm." More specifically, appellant asserts the government's failure of proof is highlighted by the lack of admitting any evidence regarding failure rates of main

parachutes, the success rate of deploying a reserve chute when needed, or the rate at which instances involving the deployment of fully operational reserve parachutes nevertheless still result in death or grievous bodily harm.

Much like *United States v. Gutierrez*, the critical question in this case is "how likely is likely?" 74 M.J. 61, 65 (C.A.A.F. 2015) (citation and internal quotation marks omitted). While the articulation of what "likely" means may be perceived as amorphous, identifying what it cannot and does not mean is fairly straightforward.

*What "Likely" Does Not Mean*

First, in accordance with *Gutierrez*, "likely" does not mean "more than merely a fanciful, speculative, or remote possibility." *Id*. at 65. In *Gutierrez*, our superior court addressed this very issue, albeit in a human immunodeficiency virus (HIV)-related aggravated assault scenario. The court stated that "nowhere in the UCMJ, in the dictionary, or in case law, is 'likely' defined as 'more than merely a fanciful, speculative, or remote possibility' as it is in HIV cases." *Id*. at 66. Consequently, that particular iteration of "likely" was rejected and two cases relying on that language were expressly overruled. *See id*. at 67-68. While we note the now discarded standard always required that the risk of harm be *more* than the concededly very low standard of mere fancy, we understand our superior court's concern with the impression the language possibly left that the risk of harm need *only* be remote or speculative.[3]

Second, "likely to produce death or grievous bodily harm" cannot mean one thing in some fact scenarios and another thing in others. As stated in *United States v. Outhier*, there is only one standard and the courts must apply one consistent standard when evaluating different "means likely." 45 M.J. 326, 328 (C.A.A.F. 1996). This point was echoed in *Gutierrez* with a caution against any sui generis definitions of "likely." 74 M.J. at 67. Accordingly, we must acknowledge that if the language, "more than merely a fanciful, speculative, or remote possibility" is eschewed for HIV-related cases, it must be equally disavowed for other scenarios such as a beating and choking case (*United States v. Weatherspoon*, 49 M.J. 209 (C.A.A.F. 1998)), a beating of a sleeping victim case (*United States v. Vigil*, 3 U.S.C.M.A. 474, 13 C.M.R. 30 (1953)), a case of fraudulent exposure of one to a drownproofing exercise (*Outhier*, 45 M.J. 326), as well as a firing a bullet into a crowd case (Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 3-54-8.d n.4).

---

[3] For example, an outcome with a virtually certain chance of occurrence would have unquestionably satisfied the now rejected standard of "*more* than fanciful, remote, or speculative."

5

Third and somewhat similar to the above point regarding consistent interpretation, "likely to produce death or grievous bodily harm" does not mean one thing for purposes of an aggravated assault charged under Article 128, UCMJ, and another for purposes of a reckless endangerment charged under Article 134, UCMJ. The government, at oral argument, astutely pointed out that Article 134 reckless endangerment is based upon the Maryland reckless endangerment statute; an offense which the Maryland courts have interpreted to be a gap-filling inchoate, perhaps doubly inchoate, crime. *See MCM*, App. 23, Analysis of Punitive Articles (Reckless endangerment), A23-26; Md. Ann. Code art. 27, § 120; *see also Williams v. State*, 100 Md. App. 468, 641 A.2d 990 (Md. Ct. Spec. App. 1994); *Minor v. State*, 326 Md. 436, 605 A.2d 138 (1992); *Minor v. State*, 85 Md. App. 305, 583 A.2d 1102 (Md. Ct. Spec. App. 1991). As such, the government urged that the offense of reckless endangerment could require a degree of likelihood less than that required by the offense of aggravated assault. Whatever the pros and cons of such an approach may be, we are compelled to apply the same definition of "likely" to reckless endangerment as to aggravated assault. Primarily, in his designation of reckless endangerment under Article 134, the President listed "likely to produce death or grievous bodily harm" as a required element and defined that element by reference to that term's definition under Article 128. *See MCM*, pt. IV, ¶¶ 100a.c.(5) and 54.c.(4)(a)(ii). Accordingly, we adhere to that definitional link between the two offenses.

Fourth, "likely" is not determined solely by risk of harm. Although *Gutierrez* rejected some analytical language used to determine risk of harm, our superior court did not jettison the historical two-pronged framework utilized to determine likelihood. The likelihood of death or grievous bodily harm has been determined by measuring and balancing two factors: (1) the risk of harm and (2) the magnitude of the harm. Where the magnitude of harm is great, "likely" may be found to exist even though the risk of harm is statistically low. *See United States v. Dacus*, 66 M.J. 235, 239-240 (C.A.A.F. 2008); *Weatherspoon*, 49 M.J. 209. *Gutierrez* only overturned the past approach to the risk of harm prong (specifically, as how it related to HIV-related cases), leaving unaddressed the magnitude of harm prong. 74 M.J. at 65 ("But this Court's case law 'does not state that because the magnitude of the harm from AIDS is great, the risk of harm does not matter.'") (quoting *Dacus*, 66 M.J. at 240 (Ryan, J., concurring)). Elementally, for the crimes of aggravated assault and reckless endangerment, the severity of harm the government must prove to be "likely" is already pre-set and established at the highest order of magnitude, that is—death or grievous bodily harm. Thus, in those cases, factoring magnitude into an analysis of likelihood could appear to be redundant.

6

We conclude the relevant analysis of magnitude of harm is more nuanced than a simple evaluation of the extent of possible[4] injuries. Assessing magnitude of harm can balance in the social utility of the actor's conduct. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.4(a)(1), at 367 (2d ed. 2003). In other words, by definition and by element, all cases charged as aggravated assault or reckless endangerment are "high" magnitude cases, but factoring in social utility or the lack thereof can help differentiate levels of magnitude. More simply put, the relative needlessness of one's actions plays a role in the analysis. For example, speeding through crowded streets for the sheer thrill of it poses a greater harm to society than doing the exact same thing for purposes of rushing one to the hospital in a case of medical emergency. In this case, failing to inspect parachutes at a CONUS installation in order to go home early is a far cry from forgoing an equipment inspection of a Quick Reaction Force speeding out the door in response to a call from troops in contact.

Fifth, "likely to produce death or grievous bodily harm" must entail something distinct, although not entirely unrelated, from simply "foreseeable." Foreseeability is a concept that is more directly applicable to the *mens rea* of the crime. For an offer type assault, the act need only be "culpably negligent." *See MCM*, pt. IV, ¶ 54.c.(1)(b)(ii); UCMJ art. 128. For reckless endangerment, the dangerous conduct must exhibit "a culpable disregard of *foreseeable* consequences" in order to be reckless. *See MCM*, pt. IV, ¶ 100a.c.(3) (emphasis added); UCMJ art. 134. So, because "likely to produce" is an element apart and separate from "reckless," it follows that although those terms are clearly interrelated, proof that an outcome was foreseeable does not per se mean that the element of "likely to produce" has also been proven.[5]

Sixth and perhaps most importantly, in this context, "likely" does not mean more likely than not. Nor does it require greater than 50% certainty. Appellant complains his conviction is insufficient because the government did not provide the statistics necessary to show his conduct was likely to produce death or grievous bodily harm. We reject any notion that statistics are required in order for the government to meet its burden in these cases. It is abundantly clear that likelihood

---

[4] We hasten to point out that for purposes of determining likelihood in cases such as these, death or grievous bodily harm must be probable, not merely possible. *See Weatherspoon*, 49 M.J. at 211. This observation, however, does not move the analytical ball much forward because it simply begs the question of "how probable is probable?"

[5] Even if "likely" and "foreseeable" were precisely coextensive, then the question in these cases of "how likely is likely?" would simply transmute into "how foreseeable is foreseeable?"

determinations involve "magnitudes of probability, not mathematical certainty." *Gutierrez*, 74 M.J. at 67 n.6.

While establishing a firm statistical threshold is not required or advisable, we are confident that wherever the legal standard does rest, it is at a point less than "more likely than not."  A likely consequence has been legally defined as one that is "natural and *probable*."  *MCM*, pt. IV, ¶ 54.c.(4)(a)(ii) (emphasis added); *see also Gutierrez*, 74 M.J. at 66.  "Probable" is an extremely common term in legal lexicon, one that has been definitively addressed by our superior court, albeit in the context of "probable cause."  While our current analysis does not concern the Fourth Amendment, the analogy is nevertheless useful.  "So even though people often use probable to mean more likely than not, probable cause does not require a showing that an event is more than 50% likely."  *United States v. Bethea*, 61 M.J. 184, 187 (C.A.A.F. 2005) (citations and internal quotation marks omitted); *see also United States v. Macomber*, 67 M.J. 214, 219 (C.A.A.F. 2009) (probable means less than preponderance).

In the hornbook *Substantive Criminal Law*, Professor LaFave extensively addresses the question of how statistically "likely" must legally "likely" be and stresses that the term "natural and probable" should not be interpreted to mean more likely than not.[6]  1 LaFave, § 5.4(g), at 377.  For example, if a person holds a revolver with a single bullet in one of the chambers, points the gun at another's head and pulls the trigger, then the risk of death is likely even though the odds that death will result are no better than one in six.  *See People v. Hall*, 999 P.2d 207, 217 (Colo. 2000).

Specifically regarding homicidal risk, Professor LaFave comments that the chances of producing death cannot and should not be measured in terms of mathematical percentages.  2 LaFave, § 14.4(a), at 437-41.  We agree.

> Thus it would be nice, but not possible, to create a table of homicidal risk [measured in percentages of chance of death] for purposes of distinguishing among homicidal crimes . . . .
>
> . . . .
>
> When defendant fired two bullets into the caboose of a passing train, thereby killing a brakeman, the chances were doubtless much greater that he would not kill than

---

[6] As a matter of illustration, Professor LaFave repeatedly comments that criminal liability for crimes involving risk of death could attach when the chance of death is as low as 1% or even less.

> that he would kill. Perhaps the chances of killing were no
> more than 5%, taking into account the area of the side of
> the caboose in relationship to the space taken up by the
> vital parts of its occupants. In view of the lack of social
> utility in shooting into the side of the caboose, the risk of
> 5% was held enough for murder in that case.

2 LaFave, § 14.4(a), at 439-40 n.22 (citing *Banks v. State*, 211 S.W. 217 (Tex. Crim. App. 1919)).[7] We point out here that for offenses which do not require death or great bodily harm to be actually inflicted, any determination of likelihood must focus on the danger the conduct posed *before* any harm that occurred as a result of that danger. The fact that something did occur does not alter the pre-existing chances that a particular outcome would occur.

### What "Likely" Does Mean

In *Gutierrez*, our superior court held that "a plain English definition" should be applied to determine likelihood of producing death or grievous bodily harm. While we certainly concur with this approach, we have found its implementation somewhat difficult. There are many reputable dictionaries and each contains multiple definitions of the word "likely." Furthermore, we have found the plain English denotations of the term somewhat different than the same term's connotations, common usage, and synonyms. Definitions of "likely to occur" range from "expected outcome" to "probable" to "something less than reasonably certain" to "justifying belief of occurrence" to "might well happen."

Other than the previously stated position that "likely" is not a preponderance standard, we decline to ascribe any more precision to that element. Consequently, we adhere to the MCM's explanation that a means, force, or conduct is likely to produce death or grievous bodily harm when that is the natural and probable result or consequence of that particular means, force, or conduct. *See* UCMJ arts. 128 and 134. This "likelihood" determination is made utilizing a common sense approach and factoring in and balancing all relevant facts and circumstances. Ultimately, the likelihood determination must clear a "reasonable threshold of probability." *Gutierrez*, 74 M.J. at 66.

---

[7] In military law, a depraved-heart murder charged under Article 118(3), UCMJ, requires a dangerous act; an act "characterized by heedlessness of the *probable* consequences of the act or omission, or indifference to the *likelihood* of death or great bodily harm." *MCM*, pt. IV, ¶ 43.c.(4)(a). Again, we note this offense also deals with legal determinations of probable consequences and not mathematical calculations of the precise odds of particular outcomes.

**CONCLUSION**

In this case, we have considered the entire record, analyzed the evidentiary facts and circumstances and how they apply to the required elements and standards, and utilized the appropriate definitions of all pertinent terms. After drawing "every reasonable inference from the evidence of record in favor of the prosecution," we determine the fact finder could have properly concluded appellant's reckless conduct was likely to produce death or grievous bodily harm. *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991). Likewise, we ourselves share that conclusion. Appellant's conviction of reckless endangerment is both factually and legally sufficient.

The findings of guilty and the approved sentence are AFFIRMED.

Judge PENLAND concurs.

WOLFE, J. concurring:

In *United States v. Gutierrez*, our superior court addressed a case of aggravated assault under Article 128, UCMJ, involving sex that included the undisclosed risk of transmission of human immunodeficiency virus (HIV). 74 M.J. 61 (C.A.A.F. 2015). The Court of Appeals for the Armed Forces (C.A.A.F.) noted that prosecutors lacked a specific punitive article addressing such misconduct and have instead "relied on generally applicable punitive articles to litigate these cases." *Id*. at 67. Our superior court analogized charging such conduct under aggravated assault as trying to "fit a round peg of conduct into a square hole of a punitive statutory provision." *Id.* (quoting *United States v. Joseph*, 37 M.J. 392, 402 (C.M.A. 1993) (Wiss, J., concurring in the result)).[1]

---

[1] The C.A.A.F. found, as a matter of law, that a victim cannot meaningfully consent to sexual intercourse without the disclosure of HIV status, and that the sexual act therefore constituted "bodily harm." *Gutierrez*, 74 M.J. at 67-68. In *Gutierrez* the C.A.A.F. found the failure to disclose appellant's HIV status constituted an "offensive touching" as his partners "did not provide informed meaningful consent." *Id*. Accordingly, the proper charge would be either 1) sexual assault by bodily harm; or 2) assault consummated by battery. UCMJ arts. 120(b)(1)(B), 128(a). In other words, the focus of the offense is not the risk of transmission of an infectious disease and its resulting harm, but rather whether the sexual conduct was consensual. With that reasoning, the *Gutierrez* court affirmed the lesser-included offense of assault consummated by battery as the victim had not provided meaningful consent. 74 M.J. at 68. As is discussed below, however, the issue in

(continued…)

(…continued)

Specifically, the C.A.A.F. was concerned that military law had "adopted a definition of 'likely' that appears to be sui generis to HIV cases . . . ." *Id.* at 66. The court echoed Judge Wiss's concern in *Joseph* that "the law should not adopt a sui generis standard in cases involving HIV exposure . . . and [that] similar concerns guide our decision today." *Id.* at 67.

As the parties and practitioners will surely note, this court's opinion today addresses a case that does not involve the risk of transmission of HIV. Nor does this case involve interpreting the offense of aggravated assault under Article 128, UCMJ. Rather, this case involves determining whether appellant criminally endangered his fellow soldiers when he "pencil packed" faulty parachutes. Thus, while it appears that our superior court's opinion in *Gutierrez* may have been intended to address the narrow line of cases involving HIV,[2] today the majority opinion is compelled to apply *Gutierrez* to entirely different circumstances.

I concur with the majority's opinion. Fidelity to our superior court's decision, which emphasized the necessity of "one standard," requires applying *Gutierrez* to all relevant cases, including this one. *Id.* at 66. I write separately only to express some separate views about the effect of this universal application.

### A. Defining the Lower Bound of "Likely"

If *Gutierrez* made one point clear, it is that it is no longer good law to define likely as "more than merely [a] fanciful, speculative, or remote possibility." 68 M.J. at 65 (citations and internal quotation marks omitted). It is also clear that the intent of our superior court was that this "floor" on the definition of "likely" was

---

this case— while also turning on the definition of "likely"—is not a matter of whether the government was trying to place a round peg into a square hole. Reckless endangerment is certainly the appropriate "hole" for appellant's alleged misconduct. The issue, instead, is whether the government has met its burden of proof that appellant's conduct was "likely" to cause death or grievous bodily harm.

[2] Specifically, our superior court stated that the definition of "likely" in *Gutierrez* was sui generis to HIV cases. *Id.* at 66 ("nowhere in the UCMJ, in the dictionary, or in case law, is "likely" defined as "more than merely a fanciful, speculative, or remote possibility" as it is in HIV cases."). As this case demonstrates, however, the definition of likely discussed in *Gutierrez* has been applied to all manner of cases of aggravated assault and reckless endangerment. *See, e.g.,* Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, paras. 3-54-8.d n.4 (Aggravated Assault), 3-100a-1.d n.2 (Reckless Endangerment) (10 Sept. 2014) (describing the instruction appropriate for any case where the likelihood of death or grievous bodily harm is at issue).

11

inappropriately low. That is, the *Gutierrez* court would have surely agreed that a fanciful, speculative or remote possibility *always* failed to constitute a "likely" possibility. Therefore, the C.A.A.F.'s apparent fear was that a panel, presented with evidence that was only a tad more than fanciful, might convict inappropriately. In other words "likely" means *more than* "more than merely a fanciful, speculative, or remote possibility."

My initial concern is that by deleting the lower bound of the definition of "likely," we invite the very result that the C.A.A.F. appears to have been trying to avoid. Prior to *Gutierrez,* a panel was at least instructed that a fanciful, speculative or remote possibility was insufficient to establish guilt.[3] What instruction now guides a panel away from finding that "a fanciful, speculative, or remote" possibility falls within the definition of likely? Put simply, if the examples of probabilities (e.g., fanciful, etc.) at the lower bound of the definition of "likely" were insufficient to protect an accused against a wrongful conviction, they should be replaced, not deleted.

While this danger was perhaps not presented in *Gutierrez*, it is not difficult to imagine a case where informing the panel that the definition of "likely" excludes possibilities that are fanciful, remote or speculative serves to prevent—rather than cause—an unjust verdict for the accused. Consider the defense counsel who could previously argue that an event was "speculative" or "remote" and then have his arguments backstopped by the military judge's instructions on those same words. Now such counsel may only argue that an event is not "likely."[4] If pressed, given both this court's and C.A.A.F.'s reluctance to further define the word, a military judge may resist providing further explanation beyond the admonition that the panel apply the "plain English definition" as stated by the C.A.A.F. *Gutierrez*, 74 M.J. at 63.

The majority, correctly, follows *Gutierrez* and declines to define the lower bound of "likely" with any more precision than our superior court. I write

---

[3] Stated differently, the *Gutierrez* court saw the requirement that the risk be "more than merely a fanciful, speculative, or remote possibility" as a sword that improperly exposed the accused to criminal liability. The court appeared to interpret this phrase as inferring that *anything* more than a fanciful, speculative or remote possibility met the definition of likely. As such, the definition was insufficient. At least in some cases, however, the definition also served as a shield that protected the accused.

[4] Arguably this was the case in *Gutierrez.* In *Gutierrez,* the court noted that the government's own expert testified that the risk of HIV transmission was only "*remotely* possible." *Id.* at 67 (emphasis added). Thus, in *Gutierrez* the appellant could have used the instructions on "remote"—now inapplicable—to argue that the government had failed to meet their burden of proof.

separately because I see a new risk that an accused is convicted on legally insufficient evidence. I see no harm in informing a panel that criminal liability does not attach to fanciful, speculative, or remote possibilities of harm. This was as true before *Gutierrez* as it is after.

### B. Purpose of Reckless Endangerment and the Upper Bound on the Definition of "Likely"

On appeal, and emphasized during oral argument, appellant asserts that "likely" means "more likely than not." While I concurred above that our ability to further define "likely" is controlled by our superior court's opinion in *Gutierrez*, I believe we are compelled to answer the question posed by appellant. For me, at least, whether the evidence is factually sufficient turns on the issue. In *United States v. Pease*, the C.A.A.F. stated that "in light of [our] responsibility" to apply the law to the facts in conducting our factual sufficiency analysis, we must "determine the correct, applicable law" in a case. 75 M.J. __, 2016 CAAF LEXIS 235 at *10-11 (C.A.A.F. 17 Mar. 2016) (finding no error in the Navy-Marine Corps Court of Criminal Appeals defining the meaning of an element).

If in determining the meaning of "likely" the danger of setting the bar too low risks an accused's improper conviction, the danger of setting the bar too high falls on society. The President has explained that the offense of reckless endangerment "is intended to prohibit and therefore *deter* reckless or wanton conduct that wrongfully creates a substantial risk of death or grievous bodily harm to others." *Manual for Courts-Martial, United States* (2012) [hereinafter *MCM*], pt. IV, ¶ 100a.c.(1) (emphasis added). That is, the purpose of this offense is to prevent dangerous reckless conduct.

Viewed through the lens of the President's explanation, and especially as applied to the offense of reckless endangerment, I agree with the majority's analysis of the definition of "likely." In order to capture the "substantial risk" of death or grievous bodily harm, the President has proscribed reckless conduct that is "likely" to result in grievous bodily harm. The majority properly rejects appellant's assertion that "likely" must be synonymous with "most likely" or "more likely than not."[5]

The President's crafting of the offense of reckless endangerment would be incongruous if one could create a "substantial risk" of death or grievous bodily harm, but have that same risk be un-*likely* to result in death or grievous bodily harm. In other words, one does not deter the reckless creation of substantial risks of death

---

[5] "More likely than not" is a familiar standard under the law (i.e., "preponderance"). Surely, if our superior court in *Gutierrez* intended "likely" to mean "more likely than not" they would have said so.

and grievous bodily harm—as the President said was the intent—if such conduct is not included within the ambit of "likely." The majority's citation to treatise and case law amply bears this out. And, on this matter, we are not blazing a new trail but are instead treading on well-worn ground. *See* 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.4(a), at 437 (2d. ed. 2003); *Black's Law Dictionary* (10th ed. 2014) (definitions of likely include "showing a strong tendency; reasonably expected"). As the United States Court of Appeals for the Third Circuit said in a different context: A "*likelihood* of success on the merits" means that a plaintiff has "a reasonable chance, or probability, of winning." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). It "does not mean more likely than not." *Id.*

One who places a single round in a revolver and pulls the trigger while pointing the weapon at someone's head has created the substantial risk of death. As cited by the majority, two definitions of likely include "justifying belief or occurrence" and "might well happen." Death is *likely* if you attempt to fire a partially loaded revolver at someone.[6] Death is the "natural and probable consequence" of that act. *See MCM*, pt. IV, ¶ 100a.c.(5) (explaining that one may infer a result is "likely" if the result is the natural and probable consequence of the conduct).

## CONCURRENCE CONCLUSION

In the present case, appellant's misconduct was likely to cause death or bodily harm to his fellow soldiers. That an improperly packed reserve parachute would result in death or grievous bodily harm was foreseeable, likely, and would have been the natural and probable outcome of his actions, even if, as appellant asserts, the government failed to prove that such an event was more likely than not.[7]

More generally, I do not have confidence that the "plain English definition" of "likely" provides clear guidance to the fact finder. There are numerous definitions of "likely" that fall all along the spectrum of probability. Appellant's assertion that "likely" means "more likely than not," while rejected, is not without support. Furthermore, if the definition of "likely" is "plain" it surely could be restated in an opinion. Instead, the majority finds itself declining to be as precise as

---

[6] If "likely" were understood to mean "more likely than not" death would only be "likely" if at least four of the six chambers were loaded.

[7] Consider that appellant would be no more guilty (or less) of this offense if his actions *had in fact* resulted in death or grievous bodily harm. It is a complete defense to the crime of reckless endangerment that, although death was in fact caused, death was not "likely." Reckless endangerment punishes the reckless, not the unlucky.

it may have been absent *Gutierrez. United States v. Herrmann*, 75 M.J. __, ARMY 20131064, slip op. at 9 (Army Ct. Crim. App. 18 Apr. 2016).

Given the many and varied definitions of "likely" contained in standard English dictionaries, we risk inconsistent application of the term—incurring at least some risk to both the accused and society. If I were writing on a clean slate, I would adopt the definition of "likely" included in Black's Law Dictionary of "reasonably expected." By requiring that the definition include an aspect of "reasonableness" we ground the definition in law, satisfy our superior court's requirement that the definition meet some "minimum threshold of probability," avoid confusion regarding "remote," "speculative," or "fanciful" possibilities, and provide guidance to the fact finder regarding a term which is used in everyday English but with a variety of meanings. However, I concur with the majority because—as to the definition of "likely"—we are required to follow our superior court's determination that the "plain English definition" shall apply. Thus, while we must address appellant's contention that "likely" means "more likely than not" to make a factual sufficiency determination in this case, we should not further define the term.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court