OPINION OF THE COURT
HAIGHT, Senior Judge:
A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of willful dereliction in the performance of his duties and reckless endangerment, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934 (2012) [hereinafter UCMJ].[1] The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for ten months, forfeiture of all pay and allowances, and reduction to the grade of E-l.
This case is before our court for review under Article 66, UCMJ,[2] Appellant assigns multiple errors and raises several issues pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A.1982). One of appellant’s assigned errors merits discussion but no relief.
BACKGROUND
Appellant was a noncommissioned officer (NCO) parachute rigger in the 10th Special Forces Group (Airborne) who was assigned as an. In-Process (IP) inspector of parachute packers at the Consolidated Parachute Rigging Facility at Fort Carson, Colorado. An IP inspector ensures the parachutes are packed in accordance with the appropriate training manual, guidelines, and standard operating procedures; ensures that all intermediate rigger checks are conducted and satisfied; and signs off on the final parachute pack reports and individual parachute pack logs. “Pencil packing” refers to a procedure in which those responsible fail to pack or inspect a parachute properly yet nevertheless fraudulently sign off on the parachute as being properly packed and inspected. At the rigging facility, not only are main parachutes packed and readied for use, but so are reserve parachutes. For safety reasons, at least every 365 days, each reserve parachute is unpacked, re-packed, inspected, and signed, off as suitable for use and “airworthy,”
On one occasion in February 2013, appellant was assigned as the IP inspector over a team of three packers detailed to re-pack a daily quota of parachutes to include some reserve parachutes that were about to go beyond the 365-day in-service cycle. The evidence in this ease showed that appellant and all three of the packers he supervised, in order to speed up the process and go home early, pencil packed approximately fourteen reserve parachutes in that they signed off on a number of parachutes without even opening or “popping” them, let alone checking, repacking, or inspecting them. Significantly, these reserve parachutes came from a. lot that had been provided to the Jumpmaster school for use as training aids in the Jump-master Personnel Inspection class. Conse *674 quently, these pai’achutes had deficiencies of varying severity intentionally rigged into them so the jumpmaster students could identify the deficiencies. The deficiencies—to include but not limited to missing ejector springs in some and faulty closing loops in others—that existed in the pencil packed chutes remained, notwithstanding the packer’s and appellant’s signatures certifying them as fit for operational use.
For this, appellant was charged with and convicted of “wrongfully and recklessly engaging] in conduct, to wit: failing to conduct Pack In-Process Inspections as the designated Pack In-Process inspector of T-11 Reserve parachutes provided to Parachute Riggers under his supervision for packing, conduct likely to cause death or grievous bodily harm to soldiers exiting an aircraft during airborne operations with the T-ll Reserve parachutes that had not been repacked, which conduct was to the prejudice of good order and discipline in the armed forces and was of a nature to bring discredit upon the armed forces.”
Appellant asserts his conviction of reckless endangerment is insufficient in that the evidence did not show that pencil packing is likely to cause death or grievous bodily harm.
LAW AND DISCUSSION
The well-known and oft-cited test for factual sufficiency is “whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of [appellant’s] guilt beyond a reasonable doubt.” United States v. Turner, 25 M.J. 324, 325 (C.M.A.1987). The test for legal sufficiency is “whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.” Id. at 324-25 (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
The elements of the offense of reckless endangerment charged under Article 134, UCMJ, as delineated by the President, are:
1)That the accused did engage in conduct;
2) That the conduct was wrongful and reckless or wanton;
3) That the conduct was likely to produce death or grievous bodily harm to another person; and
4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
Manual for Courts—Martial, United States (2012 ed.) [hereinafter MCM ], pt. IV, ¶ 100a.b.

Testimony at Trial

In order to show the likely consequences of appellant’s willful dereliction, the government presented to the fact finder the following testimonies. First, the NCO in charge of the rigger facility decried pencil packing as “life threatening.” Then, he stated, “If parachutes are [compromised], lives are in danger and what I mean by [compromised], if they weren’t packed as they were supposed to be, lives are potentially in danger. If they weren’t inspected as they were supposed to be, lives are potentially in danger.” To illustrate his point, this witness elaborated that if one jumped and the main parachute lost its lift capability, and the reserve parachute with its rigged-in deficiency such as a missing ejector spring was relied upon, the “plausible outcome” would be death and “you would die” or at least “be injured severely.”
Second, the rigger shop Officer-In-Charge said that if one were to have needed to employ one of the pencil packed parachutes with its now known deficiencies, that user would “potentially die or get seriously hurt.” Furthermore, this witness revealed that his testimony regarding the potentiality of death as a consequence of this type of behavior was based upon his “seeing” a “daughter lose a dad” as a result of “deficiencies in a reserve parachute or a parachute of any kind.”
Third, the military’s T-ll parachute project lead, a Senior Aerospace Engineer, explained that “everything with respect to a parachute, main or reserve, is especially important when inspecting it to make sure that it’s airborne safe and airborne certified to jump, ready to jump.” He further elaborat *675 ed that a reserve parachute with one of the specific deficiencies identified as existing in the pencil packed chutes such as a missing ejector spring or inadequate closing loop could either not quickly deploy or unintentionally deploy. In either scenario, the deficiency could “potentially cause serious injury or death to the paratrooper.”
One of the other IP inspectors at the facility on the day in question expressed, “It’s dangerous, sir. There is a reason those parachutes have to be pulled down and repacked because that reserve is the last line of defense for a jumper if there is an issue with the main parachute. To put a product out on a jumper that’s not to standard is not acceptable” and could lead to death if “that reserve is not to standard.” This same witness continued, “I was the malfunctions officer on a parachute fatality the December prior to that. It was a pretty brutal experience and I was hypersensitive to the fact that potentially there was somebody missing a [functional] reserve parachute.”
At trial, while the element of likelihood of death or grievous bodily harm was not expressly conceded by the defense, the record of trial does not reveal much dispute over this particular aspect. In fact, in his sentencing argument, trial defense counsel acknowledged that all of appellant’s confederates agreed that their actions “endangered life.” Appellant now argues “the government failed to prove that it was likely that the reserve parachutes would have been necessary during a jump and, if deployed, would have failed, and that failure would have [led] to death or grievous bodily harm.” More specifically, appellant asserts the government’s failure of proof is highlighted by the lack of admitting any evidence regarding failure rates of main parachutes, the success rate of deploying a reserve chute when needed, or the rate at which instances involving the deployment of fully operational reserve parachutes nevertheless still result in death or grievous bodily harm.
Much like United States v. Gutierrez, the critical question in this case is “how likely is likely?” 74 M.J. 61, 66 (C.A.A.F.2015) (citation and internal quotation marks omitted). While the articulation of what “likely” means may be perceived as amorphous, identifying what it cannot and does not mean is fairly straightforward.

What “Likely” Does Not Mean

First, in accordance with Gutierrez, “likely” does not mean “more than merely a fanciful, speculative, or remote possibility.” Id. at 66. In Gutierrez, our superior court addressed this very issue, albeit in a human immunodeficiency virus (HIV)-related aggravated assault scenario. The court stated that “nowhere in the UCMJ, in the dictionary, or in case law, is ‘likely’ defined as ‘more than merely á fanciful, speculative, or remote possibility’ as it is in HIV cases.” Id. at 66. Consequently, that particular iteration of “likely” was rejected and two cases relying on that language were expressly overruled. See id. at 67-68. While we note the now discarded standard always required that the risk of harm be more than the coneededly very low standard of mere fancy, we understand our superior court’s concern with the impression the language possibly left that the risk of harm need only be remote or speculative.[3]
Second, “likely to produce death or grievous bodily harm” cannot mean one thing in some fact scenarios and another thing in others. As stated in United States v. Outhier, there is only one standard and the courts must apply one consistent standard when evaluating different “means likely.” 45 M.J. 326, 328 (C.A.A.F.1996). This point was echoed in Gutierrez with a caution against any sui generis definitions of “likely.” 74 M.J. at 67. Accordingly, we must acknowledge that if the language, “more than merely a fanciful, speculative, or remote possibility” is eschewed for HIV-related cases, it must be equally disavowed for other scenarios such as a beating and choking case (United States v. Weatherspoon, 49 M.J. 209 (C.A.A.F.1998)), a beating of a sleeping victim case (United States v. Vigil, 3 USCMA 474, 13 C.M.R. 30 (1953)), a case of fraudulent exposure of one to a drownproofing exercise (Outhier, 46 *676 M.J. 326), as well as a firing a bullet into a crowd case (Dep’t of Army, Pam. 27-9, Legal Services: Military Judges’ Benchbook, para. 3-54-8,d n.4).
Third and somewhat similar to the above point regarding consistent interpretation, “likely to produce death or grievous bodily harm” does not mean one thing for purposes of an aggravated assault charged under Article 128, UCMJ, and another for purposes of a reckless endangerment charged under Article 134, UCMJ. The government, at oral argument, astutely pointed out that Article 134 reckless endangerment is based upon the Maryland reckless endangerment statute; an offense which the Maryland courts have interpreted to be a gap-filling inchoate, perhaps doubly inchoate, crime. See MCM, App. 23, Analysis of Punitive Articles (Reckless endangerment), A23-26; Md. Ann.Code art. 27, § 120; see also Williams v. State, 100 Md.App. 468, 641 A.2d 990 (Md.Ct.Spec.App.1994); Minor v. State, 326 Md. 436, 605 A.2d 138 (1992); Minor v. State, 85 Md.App. 305, 583 A.2d 1102 (Md.Ct.Spec.App.1991). As such, the government urged that the offense of reckless endangerment could require a. degree of likelihood less than that required by the offense of aggravated assault. Whatever the pros and cons of such an approach may be, we are compelled to apply the same definition of “likely” to reckless endangerment as to aggravated assault. Primarily, in his designation of reckless endangerment under Article 134, the President listed “likely to produce death or grievous bodily harm” as a required element and defined that element by reference to that term’s definition under Article 128. See MCM, pt. IV, H1fl00a.c.(5) and 54.-c.(4)(a)(ii). Accordingly, we adhere to that definitional link between the two offenses.
Fourth, “likely” is not determined solely by risk of harm. Although Gutierrez rejected some analytical language used to determine risk of harm, our superior court did not jettison the historical two-pronged framework utilized to determine likelihood. The likelihood of death or grievous bodily harm has been determined by measuring and balancing two factors: (1) the risk of harm and (2) the magnitude of the harm. Where the magnitude of harm is great, “likely” may be found to exist even though the risk of harm is statistically low. See United States v. Dacus, 66 M.J. 235, 239-240 (C.A.A.F. 2008); Weatherspoon, 49 M.J. 209. Gutierrez only overturned the past approach to the risk of harm prong (specifically, as how it related to HIV-related cases), leaving unaddressed the magnitude of harm prong. 74 M.J. at 65 (“But this Court’s case law ‘does not state that because the magnitude of the harm from AIDS is great, the risk of harm does not matter.’ ”) (quoting Dacus, 66 M.J. at 240 (Ryan, J., concurring)). Elementally, for the crimes of aggravated assault and reckless endangerment, the severity of harm the government must prove to be “likely” is already pre-set and established at the highest order of magnitude, that is—death or grievous bodily harm. Thus, in those cases, factoring magnitude into an analysis of likelihood could appear to be redundant.
We conclude the relevant analysis of magnitude of harm is more nuanced than a simple evaluation of the extent of possible[4] injuries. Assessing magnitude of harm can balance in the social utility of the actor’s conduct. See 1 Wayne R. LaFave, Substantive Criminal Law § 5.4(a)(1), at 367 (2d ed. 2003). In other words, by definition and by element, all cases charged as aggravated assault or reckless endangerment are “high” magnitude eases, but factoring in social utility or the lack thereof can help differentiate levels of magnitude. More simply put, the relative needlessness of one’s actions plays a role in the analysis. For example, speeding through crowded streets for the sheer thrill of it poses a greater harm to society than doing the exact same thing for purposes of rushing one to the hospital in a case of medical emergency. In this case, failing to inspect parachutes at a CONUS installation in order to go home early is a far cry from *677 forgoing an equipment inspection of a Quick Reaction Force speeding out the door in response to a call from troops in contact.
Fifth, “likely to produce death or grievous bodily harm” must entail something distinct, although not entirely unrelated, from simply “foreseeable.” Foreseeability is a concept that is more directly applicable to the mens rea of the crime. For an offer type assault, the act need only be “culpably negligent.” See MCM, pt. IV, ¶ 54.c,(l)(b)(ii); UCMJ art. 128. For reckless endangerment, the dangerous conduct must exhibit “a culpable disregard of foreseeable consequences” in order to be reckless. See MCM, pt. IV, ¶ 100a.c.(3) (emphasis added); UCMJ art. 134. So, because “likely to produce” is an element apart and separate from “reckless,” it follows that although those terms are clearly interrelated, proof that an outcome was foreseeable does not per se mean that the element of “likely to produce” has also been proven.[5]
Sixth and perhaps most important ly, in this context, “likely” does not mean more likely than not. Nor does it require greater than 50% certainty. Appellant complains his conviction is insufficient because the government did not provide the statistics necessary to show his conduct was likely to produce death or grievous bodily harm. We reject any notion that statistics are required in order for the government to meet its burden in these cases. It is abundantly clear that likelihood determinations involve “magnitudes of probability, not mathematical certainty.” Gutierrez, 74 M.J. at 67 n. 6.
While establishing a firm statistical threshold is not required or advisable, we are confident that wherever the legal standard does rest, it is at a point less than “more likely than not.” A likely consequence has been legally defined as one that is “natural and probable.” MCM, pt. IV, ¶ 64.c.(4)(a)(ii) (emphasis added); see also Gutierrez, 74 M.J. at 66. “Probable” is an extremely common term in legal lexicon, one that has been definitively addressed by our superior court, albeit in the context of “probable cause.” While our current analysis does not concern the Fourth Amendment, the analogy is nevertheless useful. “So even though people often use probable to mean more likely than not, probable cause does not require a showing that an event is more than 50% likely.” United States v. Bethea, 61 M.J. 184, 187 (C.A.A.F.2005) (citations and internal quotation marks omitted); see also United States v. Macomber, 67 M.J. 214, 219 (C.A.A.F.2009) (probable means less than preponderance).
In the hornbook Substantive Criminal Law, Professor LaFave extensively addresses the question of how statistically “likely” must legally “likely” be and stresses that the term “natural and probable” should not be interpreted to mean more likely than not.[6] 1 LaFave, § 5.4(g), at 377. For example, if a person holds a revolver with a single bullet in one of the chambers, points the gun at another’s head and pulls the trigger, then the risk of death is likely even though the odds that death will result are no better than one in six. See People v. Hall, 999 P.2d 207, 217 (Colo.2000).
Specifically regarding homicidal risk, Professor LaFave comments that the chances of producing death cannot and should not be measured in terms of mathematical percentages. 2 LaFave, § 14.4(a), at 437-41. We agree.
Thus it would be nice, but not possible, to create a table of homicidal risk [measured in percentages of chance of death] for purposes of distinguishing among homicidal crimes....
[[Image here]]
When defendant fired two bullets into the caboose of a passing train, thereby killing a brakeman, the chances were doubtless much greater that he would not kill than that he would kill. Perhaps the chances of killing were no more 'than 5%, taking into account the area of the side of the caboose in relationship to the space taken up by the vital parts of its occupants. In view of *678 the lack of social utility in shooting into the side of the caboose, the risk of 5% was held enough for murder in that case.
2 LaFave, § 14.4(a), at 439-40 n.22 (citing Banks v. State, 85 Tex.Crim. 165,211 S.W. 217 (Tex.Crim.App.1919)).[7] We point out here that for offenses which do not require death or great bodily harm to be actually inflicted, any determination of likelihood must focus on the danger the conduct posed before any harm that occurred as a result of that danger. The fact that something did occur does not alter the pre-existing chances that a particular’ outcome would occur.

What “Likely” Does Mean

In Gutierrez, our superior court held that “a plain English definition” should be applied to determine likelihood of producing death or grievous bodily harm. While we certainly concur with this approach, we have found its implementation somewhat difficult. There are many reputable dictionaries and each contains multiple definitions of the word “likely.” Furthermore, we have found the plain English denotations of the term somewhat different than the same term’s connotations, common usage, and synonyms. Definitions of “likely to occur” range from “expected outcome” to “probable” to “something less than reasonably certain” to “justifying belief of occurrence” to “might well happen.”
Other than the previously stated position that “likely” is not' a preponderance standard, we decline to ascribe any more precision to that element. Consequently, we adhere to the MCM’s explanation that a means, force, or conduct is likely to produce death or grievous bodily harm when that is the natural and probable result or consequence of that particular means, force, or conduct. See UCMJ arts. 128 and 134. This “likelihood” determination is made utilizing a common sense approach and factoring in and balancing all relevant facts and circumstances. Ultimately, the likelihood determination must clear a “reasonable threshold of probability.” Gutierrez, 74 M.J. at 66.
CONCLUSION
In this case, we have considered the entire record, analyzed the evidentiary facts and circumstances and how they apply to the required elements and standards, and utilized the appropriate definitions of all pertinent terms. After drawing “every reasonable inference from the evidence of record in favor of the prosecution,” we determine the fact finder could have properly concluded appellant’s reckless conduct was likely to produce death or grievous bodily harm. United States v. Blocker, 32 M.J. 281, 284 (C.M.A.1991). Likewise, we ourselves share that conclusion. Appellant’s conviction of reckless endangerment is both factually and legally sufficient.
The findings of guilty and the approved sentence are AFFIRMED.
Judge PENLAND concurs.

. The military judge acquitted appellant of solicitation to commit an offense, false official statement (two specifications), and obstruction of justice.

. Oral argument in this case was heard in Columbus, Ohio on 11 January 2016 at the Ohio State University Moritz College of Law as part of the Outreach Program of the-United States Army Court of Criminal Appeals.

. For example, an outcome with a virtually certain chance of occurrence would have unques-' tionably satisfied the now rejected standard of “more than fanciful, remote, or speculative.”

, We hasten to point out that for purposes of determining likelihood in cases such as these, death or grievous bodily harm must be probable, not merely possible. See Weatherspoon, 49 M.J. at 211, This observation, however, does not move the analytical ball much forward because it simply begs the question of "how probable is probable?”

. Even if "likely” and "foreseeable" were precisely coextensive, then the question in these cases of "how likely is likely?" would simply transmute into "how foreseeable is foreseeable?”

. As a matter of illustration, Professor LaFave repeatedly comments that criminal liability for crimes involving risk of death could attach when the chance of death is as low as 1% or even less.

. In military law, a depraved-heart murder charged under Article 118(3), UCMJ, requires a dangerous act; an act "characterized by heedlessness of the probable consequences of the act or omission, or indifference to the likelihood of death or great bodily harm.” MCM, pt. IV, ¶ 43.-c.(4)(a). Again, we note this offense also deals with legal determinations of probable consequences and not mathematical calculations of the precise odds of particular outcomes.