*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————————

### UNITED STATES
Appellee

**v.**

### Jared D. HERRMANN, Sergeant
United States Army, Appellant

**No. 16-0599**

Crim. App. No. 20131064

Argued April 5, 2017—Decided June 19, 2017

Military Judge: Timothy Grammel

For Appellant: *Captain Patrick J. Scudieri* (argued); *Colonel Mary J. Bradley, Lieutenant Colonel Melissa R. Covolesky, Major Christopher D. Coleman,* and *Captain Cody Cheek* (on brief).

For Appellee: *Major Anne C. Hsieh* (argued); *Colonel Mark H. Sydenham* and *Lieutenant Colonel A. G. Courie III* (on brief); *Captain Samuel E. Landes.*

Amicus Curiae for Appellant: *Christopher M. Calpin* (law student) (argued); *Lauren E. Bartlett,* Esq. (supervising attorney) (on brief)—Claude W. Pettit College of Law, Ohio Northern University.

Judge OHLSON delivered the opinion of the Court, in which Chief Judge ERDMANN, and Judges STUCKY, RYAN, and SPARKS, joined.

————————————

Judge OHLSON delivered the opinion of the Court.[1]

A military judge sitting alone as a general court-martial convicted Appellant, contrary to his pleas, of one specification of willful dereliction of duty and one specification of reckless endangerment, in violation of Articles 92 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892,

---

[1] We heard oral argument in this case at the Claude W. Pettit College of Law, Ohio Northern University, Ada, Ohio, as part of the Court's "Project Outreach." *See United States v. Mahoney*, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

934 (2012). The military judge sentenced Appellant to a reduction in grade to E-1, forfeiture of all pay and allowances, confinement for ten months, and a bad-conduct discharge. The convening authority approved the sentence as adjudged.

Upon review, the United States Army Court of Criminal Appeals (CCA) affirmed the findings and the approved sentence. *See United States v. Herrmann*, 75 M.J. 672, 678 (A. Ct. Crim. App. 2016). We granted review on the following issue:

> Whether the evidence is legally sufficient to find Appellant committed reckless endangerment, which requires proof the conduct was likely to produce death or grievous bodily harm.

*United States v. Herrmann*, 75 M.J. 467, 468 (C.A.A.F. 2016).

Upon viewing the evidence in the light most favorable to the Government, we conclude that a rational trier of fact could have found that Appellant's conduct in this case was likely to produce death or grievous bodily harm. Accordingly, we affirm the decision of the CCA.

## I. Background

During the relevant time period, Appellant served in the 10th Special Forces Group (Airborne) at Fort Carson, Colorado, and supervised soldiers who packed parachutes at the Consolidated Parachute Rigging Facility located there. In his supervisory capacity, Appellant was responsible for ensuring that the soldiers packed the parachutes in accordance with the applicable training manual. Further, Appellant was responsible for signing off on each repacked parachute, signifying that the parachutes had been properly packed and inspected and were suitable for use.

In February of 2013, Appellant supervised three packers who were detailed to repack sixteen parachutes each, approximately fourteen of which were reserve parachutes later identified as being "pencil packed."[2] These reserve para-

---

[2] "Pencil packing" refers to illicit conduct where a soldier responsible for packing or inspecting a parachute fails to do so, but then falsely indicates in writing that the proper packing and in-

chutes had two important characteristics. First, they were at the end of their 365-day cycle. In other words, these parachutes had last been packed a year earlier and, according to standard operating procedures, needed to be repacked in order to ensure that the passage of time had not affected their "airworth[iness]." Second, this particular group of reserve parachutes had recently been used as training aids during the Jumpmaster Personnel Inspection class. Consequently, certain deficiencies had been purposely rigged into these parachutes to ensure that trainees could properly identify safety issues.

On the day in question—and in an effort to go home early—Appellant obtained from the soldiers he was supervising an agreement to participate in a plan to "pencil pack" these particular reserve parachutes. As a result, even though Appellant knew that the parachutes had not been opened, examined, repacked, and inspected according to the training manual, Appellant simply signed the appropriate Department of the Army form and the parachute logbook, falsely attesting that he had inspected the parachutes at every checkpoint and that they were airworthy. These "pencil-packed" parachutes were then placed back into the "ready-for-issue" cage.

After a sergeant at the Consolidated Parachute Rigging Facility became suspicious about the speed with which some of these parachutes had been packed, the noncommissioned-officer-in-charge (NCOIC) inspected them. He discovered such deficiencies as missing ejector springs and defective closing loops.

Based on the ensuing investigation, Appellant was charged with a variety of offenses, to include reckless endangerment. At trial, the soldiers who had been supervised by Appellant admitted to the "pencil-packing" incident. The Government also introduced evidence on the following points:

---

specting procedures were followed. *See United States v. Herrmann*, 75 M.J. 672, 673 (A. Ct. Crim. App. 2016).

(a) Ejector Springs

(i) ejector springs thrust a canopy outward and are critical to the proper opening and quick deployment of a reserve parachute;

(ii) some of the "pencil-packed" reserve parachutes were missing ejector springs;

(iii) a lack of ejector springs can result in a delay in the opening of a reserve parachute, "potentially caus[ing] serious injury or death to the paratrooper";

(b) Closing Loops

(i) closing loops keep the parachute canopy secure within the pack tray, preventing the parachute from unintentionally deploying;

(ii) some of the "pencil-packed" parachutes had knots in their closing loops;

(c) Cotton Ties

(i) cotton ties that are part of the parachute rigging can degrade due to moisture (such as from rain or humidity);

(ii) the opening shock from a deployed parachute that has degraded cotton ties may be unusually violent, causing the parachute not to open properly;

(d) Unintentional Deployment

(i) a senior aerospace engineer testified that if a jumper had been issued one of these defective reserve parachutes and was merely standing in the doorway of the aircraft preparing to jump, the reserve parachute could have unintentionally deployed because of closing loops that had been stretched out over time;

(ii) this unintentional deployment of the reserve parachute then could have extracted the jumper from the aircraft, "potentially [resulting in] a severe injury, if not leading to death"; and

(e) Potential for Death or Grievous Bodily Harm

(i) the NCOIC at the parachute rigging facility testified that jumpers "can potentially die or get seriously hurt" if they use a "pencil-packed" parachute, and he knew how defi-

ciencies in parachutes "can potentially cause death" because he had "seen a daughter lose a dad."

## II. Analysis

We review questions of legal sufficiency de novo. *United States v. Ashby*, 68 M.J. 108, 115 (C.A.A.F. 2009). In conducting this legal sufficiency review, "the relevant question an appellate court must answer is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (internal quotation marks omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Although Appellant acknowledges the applicability of this standard of review to the instant case, he argues that his conviction for reckless endangerment cannot withstand a legal sufficiency review by this Court. Specifically, Appellant avers that our recent decision in *United States v. Gutierrez*, 74 M.J. 61 (C.A.A.F. 2015), serves as binding precedent in this case, and that the *Gutierrez* decision precludes this Court from concluding that, under the attendant circumstances, Appellant's conduct was "likely" to result in death or serious bodily harm. We disagree both with Appellant's premise and his conclusion.

### A. Applicability of *Gutierrez*

First, we conclude that our holding in *Gutierrez* is not particularly relevant to, or particularly helpful in deciding, the instant case. In *Gutierrez* the appellant was convicted at trial of aggravated assault for engaging in sexual activity with multiple partners without first disclosing that he was infected with the human immunodeficiency virus (HIV). *Id.* at 63. A government expert at the court-martial testified that, in a worst case scenario, the appellant's conduct had a 1-in-500 chance of producing death or grievous bodily harm. *Id.* On appeal, this Court concluded that the appellant's conviction for aggravated assault was not legally sufficient because this statistic did not meet the element of "likely" to produce death or grievous bodily harm: "[I]n law, as in plain English, an event is not 'likely' to occur when there is a 1-in-500 chance of occurrence." *Id.* at 67.

*Gutierrez* differs substantially from the instant case. *Gutierrez* was a highly fact-specific case involving the probability of transmitting HIV, as demonstrated by scientifically derived statistics. The instant case involves the likelihood of "pencil-packed" parachutes causing parachutists to experience death or serious bodily harm, where the probability of that harm cannot be determined either scientifically or with any degree of precision.

Further, our holding in *Gutierrez* was intended as a course correction where a minimalist approach regarding what constitutes "likely" had crept into our jurisprudence in HIV cases. Specifically, in *United States v. Joseph*, we had ratified the notion that the term "likely" equates to anything more than "'merely a fanciful, speculative, or remote possibility.'" 37 M.J. 392, 397 (C.M.A. 1993) (quoting *United States v. Johnson*, 30 M.J. 53, 57 (C.M.A. 1990)). In *Gutierrez*, we decided to "expressly overrule" *Joseph* and the low standard for "likely" which had been used in that case. 74 M.J. at 68.

Finally, our decision in *Gutierrez* stands for the proposition of what does *not* constitute "likely"; it provides no definitive answer that we can adopt in the instant case about what *does* constitute "likely." Thus, contrary to Appellant's argument, our holding in *Gutierrez* is not dispositive of the instant case.

## B.  Meaning of "Likely"

The only contested point in the case before us is what the term "likely" means in the context of the third element of the offense of reckless endangerment. This element reads as follows: "That the conduct was *likely* to produce death or grievous bodily harm to another person." *Manual for Courts-Martial, United States* pt. IV, para. 100a.b.(3) (2012 ed.) (*MCM*) (emphasis added).

We preliminarily note two points. First, the concept of what constitutes "likely" must be applied consistently from one UCMJ offense to another. *United States v. Outhier*, 45 M.J. 326, 328 (C.A.A.F. 1996); *see MCM* pt. IV, para. 54.b.(4) (Article 128—Aggravated assault); *MCM* pt. IV, para. 100a.c.(5) (Article 134—Reckless endangerment). And second, the question of whether certain conduct is "likely" to

result in death or grievous bodily harm must be measured by two factors: one, the risk that harm will actually occur; and two, the magnitude of that harm if it does occur. *See United States v. Dacus*, 66 M.J. 235, 239–40 (C.A.A.F. 2008).

We conclude that a "plain language" analysis of the relevant text is dispositive of the issue before us. *See United States v. Schell*, 72 M.J. 339, 343 (C.A.A.F. 2013); *see also EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016) ("'[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" (alteration in original) (citations omitted)). We note that the word "likely" is not a term of art or an arcane article of the law. Rather, it is used in everyday life with great frequency and its meaning is not difficult to grasp. Accordingly, we hold the following: a determination of whether death or grievous bodily harm is a "likely" result of an accused's conduct under the provisions of Article 134, UCMJ, is based on the trier of facts' commonsense, everyday understanding of that term as applied to the totality of the circumstances. This approach is consistent with the President's explanatory text regarding the offense of reckless endangerment, which states that "[w]hen the natural or probable consequence of particular conduct would be death or grievous bodily harm, it may be inferred that the conduct is 'likely' to produce that result." *MCM* pt. IV, para. 100a.c.(5).[3]

## C. Legal Sufficiency Analysis

Applying an everyday understanding of the term "likely" to the totality of the circumstances in the instant case, we conclude that Appellant's conviction for reckless endangerment is legally sufficient. We preliminarily note that there can be little doubt that if one of the "pencil-packed" reserve parachutes had unintentionally deployed as a jumper prepared to exit an aircraft, or if one of those parachutes had failed to deploy when a jumper required one due to a malfunction with his or her main parachute, death or grievous

---

[3] "Although *MCM* explanations of offenses are not binding on this Court, they are generally treated as persuasive authority to be evaluated in light of this Court's precedent." *United States v. Miller*, 67 M.J. 87, 89 (C.A.A.F. 2008) (citations omitted).

bodily harm would almost certainly have been the result. Accordingly, we conclude that the second prong of the *Dacus* test pertaining to the magnitude of the potential harm has been met here. *See Dacus*, 66 M.J. at 239–40. Therefore, our primary focus must be on the first factor—whether it was likely that the harm would actually occur. *See id.* Specifically, in the instant case we must analyze whether it was likely that one of the "pencil-packed" reserve parachutes actually would have been issued to a paratrooper, and then whether it would have malfunctioned aboard an aircraft or during a jump.

Examining the evidence in the light most favorable to the Government, a rational finder of fact could have found the following points beyond a reasonable doubt:[4] (a) the "pencil-packed" reserve parachutes were placed in the "ready-for-issue" cage, and thus were subject to distribution to paratroopers during the next 365-day cycle; (b) these parachutes were no longer airworthy because of significant safety deficiencies such as missing ejector springs, knotted and stretched out closing loops, and degraded cotton ties; and (c) the natural and probable consequence of these safety deficiencies was an unintentional deployment of the "pencil-packed" parachute prior to a jump, or a malfunction of such a parachute in the course of a jump, leading to the death or grievous bodily harm of the parachutist or other soldiers. Therefore, we conclude that the evidence in the instant case is legally sufficient to find that Appellant committed the offense of reckless endangerment.

---

[4] We note, of course, that throughout a court-martial the burden remains on the government to prove that death or grievous bodily harm was a "likely" consequence of an accused's conduct. But as a corollary, we note that the defense may seek to introduce evidence at trial which serves to thwart this goal of the government. In the instant case, the record reflects little evidence that was introduced before the military judge that tended to counter the Government's argument that the "pencil-packed" reserve parachutes likely would have been issued to paratroopers, and that they likely would have malfunctioned aboard an aircraft or during a jump.

### III. Conclusion

The decision of the United States Army Court of Criminal Appeals is hereby affirmed.