*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
KING, GASTON, and STEPHENS
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Jason S. DOYLE**
Lieutenant Commander (O-4), U.S. Navy
Appellant

**No. 201900190**

Decided: 31 August 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Ann K. Minami (arraignment)
Colleen Glaser-Allen (trial)

Sentence adjudged 2 April 2019 by a general court-martial convened at Naval Base Kitsap, Bremerton, Washington, consisting of military judge alone. Sentence approved by the convening authority: a reprimand, confinement for nine months, and a dismissal.

For Appellant:
*Lieutenant Commander Christopher Riedel, JAGC, USN*

For Appellee:
*Major Kyle Meeder, USMC*
*Lieutenant Kimberly Rios, JAGC, USN*
*Lieutenant Kevin G. Edwards II, JAGC, USN*
*Lieutenant Joshua C. Fiveson, JAGC, USN*

*31 August 2020: Administrative correction, counsel updated.*

Senior Judge KING delivered the opinion of the Court, in which Senior Judge GASTON and Senior Judge STEPHENS joined.

———————————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

———————————————

KING, Senior Judge:

Appellant was convicted, pursuant to his plea, of one specification of aggravated assault with means likely to produce death or grievous bodily injury in violation of Article 128, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 928 (2012 & Supp. IV 2017) for "strangling" his girlfriend, D.G.

Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), Appellant asserts both that the sentence to be dismissed from the Naval Service was inappropriately severe and that the trial counsel "enflamed the military judge with improper sentencing argument" by referring to dismissed charges and by referring to Appellant as a "monster." Having carefully considered these assignments of error, we find them to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987), *cert. denied*, 485 U.S. 968 (1988).

During the course of our review, we specified the following issue:

> whether there is an adequate factual basis in the record of trial to support Appellant's guilty plea to aggravated assault when Appellant admits to "strangling" D.G. but that term is neither defined by the military judge nor used in a context to indicate grievous bodily harm was the "natural and probable consequence" of that action? Record at 174, 177; *United States v. Gutierrez*, 74 M.J. 61, 66 (C.A.A.F. 2015); *Manual for Courts-Martial, United States* (2016 ed.), Part IV ¶ 54.c(4)(a)(ii). *See United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969). *See generally United States v. Herrmann*, 76 M.J. 304 (C.A.A.F. 2017).

After considering the parties' briefs, we set aside Appellant's conviction and sentence, return the case to the convening authority, and authorize a rehearing.

## I. BACKGROUND

Appellant met D.G. in Jacksonville, Florida in April 2016 through an online dating site and they were engaged approximately seven months later. D.G. had two minor sons from a previous relationship. Appellant received permanent change of station orders and, in March 2017, he moved to Whidbey Island, Washington. Despite this fact, in June 2017, he and D.G. purchased a house together in Jacksonville, into which D.G. and her sons moved. Appellant planned to visit D.G. regularly.

In December 2017, Appellant returned to Jacksonville for his Christmas leave period and stayed in their home, although, by then, the relationship had turned "difficult" and D.G. had stopped wearing her engagement ring. While at the home, Appellant realized that the couple were "not on the same terms" regarding the relationship and he slept on the couch. While the relationship was troubled, Appellant was hoping to work to improve it. But the week before Appellant assaulted D.G., Appellant found an overnight bag from an unknown male in their bathroom.

On the night he assaulted D.G., Appellant went alone to play trivia with her parents while D.G. stayed home to watch her two children. When Appellant returned, D.G. told Appellant he would need to make plans for himself on 22 and 23 December because she would not be home. These were the two days that D.G.'s children would be with their father and D.G. told Appellant that she would be going out with a man whom she had been seeing since October, the man whose bag Appellant had found in their bathroom. Although D.G. was seeing another man, she assured Appellant that "they could still do Christmas together." Appellant was devastated and a confrontation ensued.

During the providence inquiry, the military judge asked Appellant how the confrontation turned physical. Appellant explained:

> ACC:  She was—saying certain things to me and she was calling, and excuse my language, but calling me a "passive pussy" and "not an aggressive man," and I wasn't an asshole and this had been a recurring theme in our relationship. That I was too nice. That I wasn't aggressive enough, that, you know, she was attracted to assholes and I was not that. And I was, you know, too passive and always too nice, you know, and she needed a bad boy and I—I'm not. I wasn't that. So in that moment, you know, this is all coming back. She's saying these things and I, you know, I wanted the relationship to work. I would, like I said, I love this

3

woman. I would do anything for her and so I reacted and—and did what—I thought, you know, she wanted to see. Now, obviously I'm not saying that she asked for it, or that—that she told me to do this. I'm—I'm wrong what I did. But, you know, I thought okay, well, she wants me to be aggressive so maybe—maybe this will work or maybe I can show her that I can be aggressive. So we were sitting on the back patio couches, you know, in our backyard. And I put my hands around her neck and—and, asking her if that's what she wanted and it clearly wasn't and—[emotional] you know, and then just more pain and—and sadness fear [emotional] and just utter—I mean, devastation.[1]

The military judge explained to Appellant the following:

MJ: You have pled guilty to the charge of aggravated assault with means or force likely. That's under Article 128 of the Uniform Code of Military Justice. The elements of that offense are as follows:

One, that, on or about 19 December 2017 . . . you did bodily harm to Ms. [D.G.];

Two, that you did so with a certain force by strangling her, by placing your hands around her neck and squeezing;

Three, that the bodily harm was done with unlawful force or violence; and

Four, that the force was used in a manner likely to produce death or grievous bodily harm.

. . . .

MJ: An act of force or violence is unlawful if done without legal justification or excuse and without the lawful consent of the victim.

"Grievous bodily harm" means serious bodily injury. Grievous bodily harm does not mean injuries such as a black eye or bloody nose, but does mean fractured, dis-

---

[1] R. at 172.

located bones, deep cuts, torn members of the body, serious damage to internal organs or other serious bodily injuries.

"Force" may mean—may be any means or object not normally considered a weapon, a force is used in a manner likely to produce death or grievous harm where—when the natural and probable consequences of its particular use would be death or grievous bodily harm. It is not necessary that death or grievous bodily harm actually was the result.

An "assault" is an attempt to offer with unlawful force or violence to do bodily harm to another. An assault in which bodily harm is inflicted is called a battery.

A "battery" is unlawful and an intentional application of force or violence to another.

The term "bodily harm" means any physical injury to or offensive touching of another person, however slight.[2]

Appellant informed the military judge that he understood the information and that he had no questions about that information. The following clarifying colloquy ensued:

> MJ: So you said you put your hands around her neck, and I understand that there was this ongoing discussion about you being more aggressive or whatever the things that were being said. But did you put your hands around her neck?
>
> ACC: Yes, I did, Your Honor.
>
> MJ: And did you squeeze her neck?
>
> ACC: I did, Your Honor.
>
> MJ: I have to ask you this again. So you said you strangled her, that's what you're describing, correct?
>
> ACC: Yes.

---

[2] R. at 157-58.

MJ: And why did you do that? Did you do that because you were angry? Did you that because you were frustrated? Why?

ACC: No, I was not angry, Your Honor. I—I was, you know, it—it was reacting to what I'd been told for the last 20 months about how I needed to act a certain way. And—and it was maybe a—it was a— trying to show her that that I—maybe I could be an asshole or I could be this bad boy. You know, it was purely reactionary to try to [scoffs] trying to show someone that maybe you could be this kind of person that, that they wanted. I mean, clearly not the right way to do it, obviously wrong.

MJ: Did you intend to do bodily harm to her?

ACC: I did not in—[conferring with counsel.]

MJ: And just to take a minute here. So "bodily harm" is an offensive touching, right?

ACC: Yes, I—

MJ: However slight.

ACC: I did, Your Honor. I—yes.

MJ: So you intended to strangle her. You intended to do bodily harm to her, correct?

ACC: Yes.

MJ: Did you strangle her with a certain force?

CIVDC: Your Honor, Lieutenant Commander Doyle is pleading guilty to bodily harm with a means likely to cause grievous bodily harm.

MJ: Right.

CIVDC: And so this would loop in the standard definition of "unlawful force," which is without legal justification or excuse, not any elevated degree of force beyond that.

MJ: Okay.

CIVDC: Although he—[clearing throat], he has already testified that he did squeeze.

MJ: Right. I'm not disagreeing with you here, but also, I define "force" as a manner likely to produce death or

grievous bodily when the natural and probable consequence of its particular use would be the grievous bodily harm. It's not necessary that that harm actually result.

CIVDC: Yes, Your Honor.

MJ: I think we're saying the same thing.

CIVDC: Yes, we are. It's a little murky between force and means, Your Honor.

MJ: I understand. So I just want to make sure that we're clear and that [Lieutenant] Commander Doyle understands what I'm asking him.

CIVDC: Yes, Your Honor.

MJ: [Lieutenant] Commander Doyle, when I ask about "certain force", it means what I just said, that basically it's something that, in that context of what you did, that it could have potentially resulted in—

ACC: Yes, Your Honor.

MJ: —harm.

ACC: Yes.

MJ: Do you agree with that?

ACC: I do, Your Honor.

MJ: All right. Do you believe that you had any legal excuse or legal justification for your conduct?

ACC: No, Your Honor.

MJ: Now, based on what you've told me, I understand there was this conversation back and forth about this behavior that you said that maybe she wanted you to be more aggressive, but did she consent to you strangling her on this occasion?

ACC: No, Your Honor.

MJ: Okay.[3]

---

[3] R. at 172-75.

After Appellant told the military judge that he believed that neither consent nor defense of another applied to his case, the military judge continued:

> MJ: And when you strangled her, was that in a way that could have or was likely to produce grievous bodily harm as I've defined that term for you?
>
> ACC: Yes, Your Honor.
>
> MJ: And why do you think that?
>
> ACC: I think that because I put my hands around her neck against her will and I was squeezing and it, you know, means likely to produce grievous bodily harm, whether or not it occurred is—is irrelevant, I mean, it could happen.
>
> MJ: And so when you think, say things that it could have done, do you mean, like it could have cut off her blood flow, potentially?
>
> ACC: Sure.
>
> MJ: Or it could have cutoff her oxygen flow?
>
> ACC: Yes, Your Honor.
>
> MJ: Those kinds of things?
>
> ACC: Yep.
>
> MJ: Then do you believe and admit that you used unlawful force against Ms. [D.G.] by strangling her, in a manner likely to produce grievous bodily harm?
>
> ACC: Yes, I do, Your Honor.[4]

After discussing the maximum punishment based on Appellant's guilty plea and taking a short recess, the military judge returned to the providence inquiry:

> MJ: I want to clarify one thing from the providence inquiry. Commander Doyle, you talked about this confrontation that you were having with Ms. [D.G.] and I understand it was very emotional for you and there was a lot of things that were being said back and

---

[4] R. at 177-78.

forth. I explained the assault consummated by a battery and means likely, this whole idea of offensive touching, right?

ACC: Yes, Your Honor.

MJ: I just have one more question to make sure that the record is absolutely clear on this. How did you know it was offensive to her?

ACC: [Pause.]

MILDC: [Softly.] Reaction.

MJ: Exactly, what was her reaction?

ACC: I mean, her reaction, fear. You could see it in her eyes, I mean, it was almost an immediate like, obviously you're—you're crossing a boundary here. And so just that look on her face and you know, and just kind of that realization of—how are you here—you know, how are you doing—I mean, speaking to yourself, how are you doing this, why are you—how are you here? And so, I guess just kind of that—that that realization that what you were doing was so egregiously wrong and seeing her face and her look. This was not okay, nor, you know, acceptable. [Sniffs.]

MJ: And so having built that relationship with her over the 20 months you described, you knew instantly that after you put your hands around her neck, that this was not something she was consenting to?

ACC: Yes, Your Honor.

MJ: And was there any physical reaction? I mean, was there gasping or choking or any of those kinds of things that you might remember?

ACC: You know, after it, Your Honor, I mean, she went inside the house and so I, I mean, I was crying on the back patio. So I—nothing I observed in that moment. I, you know what—but—

MILDC: Just a moment, Your Honor.

MJ: Of course.

CIVDC: [Conferring with Appellant.]

> ACC: So in that moment, Your Honor, I'm not too sure but I've read the report. I've seen the photos. You know, I know that there was harm done, physical harm done to her that I committed. [Pause.] Yeah.[5]

The stipulation of fact stated, in relevant part:

> I agree and admit that, in the course of our argument, I did bodily harm to Ms. [D.G.] I did this by means of strangulation with my hands. I agree and admit that I used my hands in a way that was . . . likely to produce grievous bodily harm, as it is the natural and probable result of strangulation. Strangulation can cause serious bodily injury by closing the airway and/or the blood flow to and from the brain.[6]

During the sentencing hearing, the Government offered evidence in aggravation that Appellant's actions caused Ms. D.G. to "lose the ability to breathe freely."[7] Additionally, over Defense objection, the Prosecution called J.M., a forensic nurse, who described strangulation as the "external force to the neck with sufficient enough pressure to be able to block either the blood flow to and from the brain, or the airway, or a combination of both of those things."[8] J.M. also testified that, depending upon "the amount of force applied, the location of the force, the duration of that force, and then the surface area of that applied force," other "serious" injuries could occur, including, "tear into the walls of the arteries where blood leaks through and that blood can clot, that clot can release and go to the brain . . . or some of the underlying fractures to the structures in the neck and whatnot."[9]

## II. Discussion

Before accepting a guilty plea, a military judge must ensure the plea is supported by a factual basis. UCMJ art. 45(a). *See also United States v. Care,* 40 C.M.R. 247 (C.M.A. 1969); Rule for Courts-Martial [R.C.M.] 910(e) ("The military judge shall not accept a plea of guilty without making such inquiry

---

[5] R. at 180-82.

[6] Pros. Ex. 1.

[7] Pros. Ex. 2 at 3.

[8] R. at 253.

[9] R. at 257, 259-60.

of the accused as shall satisfy the military judge that there is a factual basis for the plea.").

> Article 45(a), UCMJ, requires military judges to reject a plea of guilty "if it appears that [an accused] has entered the plea of guilty improvidently." To prevent the acceptance of improvident pleas, [the Court of Appeals for the Armed Forces] has long placed a duty on the military judge to establish, on the record, the factual bases that establish that "the acts or omissions of the accused constitute the offense or offenses to which he is pleading guilty." If the military judge fails to establish that there is an adequate basis in law and fact to support the accused's plea during the *Care* inquiry, the plea will be improvident."

*United States v. Nance*, 67 M.J. 362, 365 (C.A.A.F. 2009), (quoting *Care*, 40 C.M.R. at 253) (citing *United States v. Inabinette*, 66 M.J. 320, 321-22 (C.A.A.F. 2008).

We review a military judge's decision to accept a guilty plea for an abuse of discretion. *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F. 1996) (citing *United States v. Gallegos,* 41 M.J. 446 (C.M.A. 1987). Military judges abuse their discretion when they accept a guilty plea without first obtaining from the accused "an adequate factual basis to support the plea." *United States v. Inabinette*, 66 M.J. 320, 322. Military judges are afforded "significant deference" in this area. *Id.* "A plea is provident so long as Appellant was 'convinced of, and [was] able to describe, all of the facts necessary to establish [his] guilt.'" *United States v. Murph*y, 74 M.J. 302, 308 (C.A.A.F. 2015) (alterations in original) (quoting *United States v. O'Connor*, 58 M.J. 450, 453 (C.A.A.F. 2003)).

Here, the military judge failed to elicit an adequate factual basis during the *Care* inquiry to support Appellant's guilty plea to aggravated assault. The specification alleged that Appellant did bodily harm to D.G. and that he did so "by strangling her with his hands with a means likely to produce death or grievous bodily harm, to wit: strangulation." The military judge, therefore, was required to elicit a factual basis that "strangling" or "squeezing" was a means or force "likely" to produce death or grievous bodily harm. Here, the military judge articulated that harm as cutting off D.G.'s air or blood supply, the "natural and probable consequence" of which would be to deprive the brain of oxygen, likely resulting in death or grievous bodily harm.

But while the military judge recited the correct standards and law, she failed to elicit from Appellant that the force he applied when he "squeezed" D.G.'s throat was sufficient to make death or grievous bodily harm the "like-

ly" result of the use of such force. Instead, when she asked Appellant "did you strangle her with a certain force," Appellant's civilian defense counsel [CIVDC] responded, "Your Honor, [Appellant] is pleading guilty to bodily harm with a means likely to cause grievous bodily harm. . . . And so this would loop in the standard definition of 'unlawful force,' which is without legal justification or excuse, not any elevated degree of force beyond that." The military judge replied,

> Right. I'm not disagreeing with you here, but also, I define "force" as a manner likely to produce death or grievous bodily [harm] when the natural and probable consequence of its particular use would be the grievous bodily harm. It's not necessary that that harm actually result. . . . I think we're saying the same thing.[10]

We think they were not. Instead, when the CIVDC answered the military judge's question to Appellant about the amount of force used by essentially reducing that force to an offensive touching, the Defense injected an inconsistency into Appellant's plea to aggravated assault. When such inconsistencies arise, "the military judge must either resolve the apparent inconsistency or reject the plea." *United States v. Hines*, 73 M.J. 119, 124 (C.A.A.F. 2014) (quoting *United States v. Goodman*, 70 M.J. 396, 399 (C.A.A.F. 2011)). That was not done, leaving unanswered on this record whether Appellant agreed that he used a "certain force" likely to produce serious bodily harm.

Nor will we accept the Government's invitation to rely upon the "everyday commonsense understanding" of strangulation.[11] Military judges have a duty "to accurately inform [an a]ppellant of the nature of his offense," and "[a]n essential aspect of informing . . . is a correct definition of legal concepts." *United States v. Negron*, 60 M.J. 136, 141 (C.A.A.F. 2004); *see also Care*, 40 C.M.R. at 541. Here, the military judge failed to define this term beyond an implication that it entailed "placing your hands around her neck and squeezing." When she asked Appellant why he believed "strangling" was likely to produce grievous bodily harm, Appellant replied only: "I think that because I put my hands around her neck against her will and I was squeezing and it, you know, means likely to produce grievous bodily harm, whether or not it occurred is—is irrelevant, I mean, it could happen."[12] When the military

---

[10] R. at 174.

[11] Gov't Supp. Br. at 14.

[12] The Government's claim that "Appellant stated that he squeezed hard enough to cut off her blood and oxygen flow" is not supported by the record.

judge asked, "like it *could have* cut off her blood flow, potentially" and "it *could have* cut off her oxygen flow," Appellant agreed that his force *could have* been likely to produce grievous bodily harm, not that the force he used was sufficient to render that harm *likely*. It is applying force sufficient to cut off blood or air flow that renders strangulation "a means likely to produce death or serious bodily harm." Simply squeezing a neck—without evidence of the amount of force used—does not *ipso facto* establish an aggravated assault. *See United States v. Knowles*, 2016 CCA LEXIS 236, at *4-5 (N-M Ct. Crim. App. Apr. 19, 2016) (unpub. op.) ("We find ample evidence in the record that death or grievous bodily harm was a likely consequence of the appellant's battery of his wife. The appellant did not merely place a hand on her throat: he pinned her down, used both hands and thumbs to cut off all oxygen, and choked her long enough for her to fade in and out of consciousness.").[13]

Because the military judge failed to resolve the inconsistency injected by the CIVDC's response to a question directed to Appellant during the *Care* inquiry, and thereafter failed to establish a factual basis that Appellant used force sufficient to make death or grievous bodily harm likely, acceptance of Appellant's guilty plea was an abuse of discretion. *See United States v. Jordan*, 57 M.J. 236, 238 (C.A.A.F. 2002) ("In order to establish an adequate factual predicate for a guilty plea, the military judge must elicit 'factual circumstances as revealed by the accused himself [that] objectively support that plea[.]'") (quoting *United States v. Davenport*, 9 M.J. 364, 367 (C.M.A. 1980)).

## III. CONCLUSION

The Appellant's guilty plea was improvident. As a result, the finding and sentence are **SET ASIDE**. A rehearing is authorized.

---

[13] The stipulation of fact does little to clarify this point, simply reiterating, "[s]trangulation *can* cause serious bodily injury by closing the airway and/or the blood flow to and from the brain." Pros. Ex. 1. Italics added.

Senior Judge GASTON and Senior Judge STEPHENS concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court